UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
AMEREX GROUP, INC. and    07 cv 3259 (HB)
AMEREX USA, INC.,

                Plaintiffs,

        -against-    DECLARATION OF
    MARK L. ANTIN
LEXINGTON INSURANCE COMPANY and    IN SUPPORT OF MOTION
WESTCHESTER SURPLUS LINES    FOR PARTIAL
INSURANCE COMPANY,    SUMMARY JUDGMENT

                Defendants.
------------------------------------------------------------X

    Mark L. Antin states under penalty of perjury that the following is true and correct:

    1.    I am a member of the law firm Gennet, Kallmann, Antin & Robinson, P.C., attorneys in the within action for Lexington Insurance Company and Westchester Surplus Lines Insurance Company (the "Excess Insurers"). I make this declaration based on my personal knowledge and a review of the file maintained by my office.

    2.    According to its Amended Complaint, Amerex Group, Inc. and Amerex USA, Inc. (collectively "Amerex"), engaged in business as a garment distributor with warehouse operations at Avenel, NJ and Mercer Island, Washington.

    3.    The Excess Insurers jointly provided insurance coverage excess to Amerex's primary insurance policy with Fireman's Fund Insurance Company (Exhibit "1"), which insured Amerex up to $2,500,000, all of which insurance was effective on August 3, 2001. The Lexington Insurance Company excess policy (Exhibit "2") and the Westchester Surplus Lines Insurance Company excess policy (Exhibit "3") are both excess to the Fireman's Fund policy.

4. Amerex submitted a claim to the Excess Insurers on or about June 12, 2003 for an alleged loss of $8,812,000 arising from an August 3, 2001 rack collapse in its warehouse in New Jersey by submission of a sworn statement in proof of loss submitted that day (Exhibit "4").

5. While the loss occurred in August 2001, Amerex refused to deal directly with Excess Insurers until June 2003, when the primary insurer on the risk, Fireman's Fund Insurance Company, paid its claim for the full amount of the $2,500,000 primary policy.

6. At that time, the Excess Insurers commenced an investigation into the facts, circumstances and amount of the claimed loss.

7. As permitted by the terms of the insurance contracts, the insurers demanded examinations under oath of Amerex representatives, and preparatory thereto, they demanded the production of a substantial number of financial and other records, many of which had not been requested or obtained by the primary insurer (Exhibit "5").

8. Amerex did not produce the documents requested by the insurers until on or about July 26, 2004 (Exhibit "6").

9. The Notice of Examination under Oath originally called for testimony to be provided on March 11, 2004. However, because production of the documents was necessary before meaningful testimony could proceed, the examinations were adjourned. *See*, for example, letter of the undersigned dated August 19, 2004 (Exhibit "7").

10. Examinations under oath of representatives of Amerex commenced on December 6, 2004, and they continued. Additional document requests arose from the testimony, and additional time was needed for Amerex to search for and obtain the documents. Continuation of examinations under oath was held in abeyance until compliance with the additional document

requests. Some of the documents were provided, and some were not. It was learned that a number of documents critical to the Amerex claim were destroyed or not maintained by Amerex. As a result, the insurers were limited in their investigation to the documents Amerex decided to maintain.

11.   During the course of their investigation, the insurers requested information as to the whereabouts of certain former Amerex employees who are expected to have knowledge regarding the reasons for the alleged loss of sales experienced by Amerex during the last quarter of 2001. Amerex refused to provide this information. As a result, the insurers were limited to the information Amerex principals or cooperative former employees were willing to provide.

12.   Examinations under oath were completed on October 25, 2005.

13.   The extensive documentation and testimony was then analyzed by the insurers' counsel and the forensic accountant. The claim was reviewed, certain decisions were made, and it was ultimately determined that the demonstrated loss of income experienced by Amerex during the loss period it identified was less than the coverage limits of the primary policy. Amerex could not establish through its business documents that the losses it experienced were attributable to the rack collapse on August 3, 2001.

14.   A denial letter dated February 21, 2006 (Exhibit "7") was written to advise Amerex of the decisions made with respect to its claim. As indicated therein, the denial offered Amerex the opportunity to listen to a presentation by the insurers' consultants, critique their conclusions and provide different or additional analyses for consideration of the insurers. In the February 21, 2006 letter, the following appears:

> Based upon the documentation, testimony and information which the

> excess insurers have been able to obtain through their investigation to this point, they are unable to conclude that Amerex's covered financial losses due to the August 3, 2001 rack collapse, exceed the limit of Amerex's primary insurance coverage. Accordingly, Amerex's claim for benefits under the excess insurers' policies is hereby respectfully declined. . . .
>
> The nature of the claims submitted and the analysis of it by the excess insurers' consultants does not lend itself to a more detailed discussion of every basis for the conclusion that the insured has failed to demonstrate covered losses in excess of primary limits. For these and other reasons, the
>
> Excess insurers seek the opportunity to meet with the insured and its representatives to explain their determination in more detail. This would also afford the insured an opportunity to respond to the claim analysis, and, should it so choose, to provide or highlight any information which it claims has not been properly considered or not given sufficient weight. If you are interested in such an offer, please contact me to arrange a meeting. We will take no further action with respect to the claim, pending a reasonable time to explore a meeting to discuss the claim and the excess insurers' findings with respect thereto.

15. The offer contained in the denial letters was accepted by Amerex. As a result, a meeting was held on April 19, 2006, attended by principals of Amerex, a claims adjuster for the insurers, forensic accountants on both sides, and counsel. Information, views about the claim, its factual basis, and supporting documentation and claim calculation methodology were discussed. Additional discussion and negotiations ensued.

16. Inability to bridge the substantial gap between the Amerex position and that of the insurers led counsel to suggest that an independent mediator might be able to assist the parties in better understanding their differences and narrowing the amount in dispute so that the parties might be able to reach an agreement regarding the damages claimed. Additional discussion and negotiations ensued.

17. The parties agreed to appoint John Kerns as their mediator. There were then

meetings between Mr. Kerns and representatives of Amerex, followed by a meeting with representatives of the insurers. Then, Mr. Kerns met with the forensic accountants, without anyone else present. This meeting occurred on or about November 1, 2006. Thereafter, the mediator conferred with the accountants and the parties for an extended period.

18. In or about April, 2007, I conferred with the mediator in an effort to determine whether sufficient progress had been made to enable the parties to reach an agreement as to the amount of the loss.

19. During the course of these discussions, I made a substantial, good faith and final offer to the mediator which he agreed to present to counsel for Amerex. I assume he did so, and I awaited a response, either from the mediator or directly from counsel for Amerex.

20. A "response" of a different nature than I expected was received when our clients reported being served with the complaint in this matter in May 2007. At that point, and not before, it became clear that Amerex had no further interest in trying to resolve the dispute.

21. Promptly upon receiving notice of the instant suit, and by letter dated June 4, 2007 (Exhibit "9"), Excess Insurers demanded appraisal pursuant to the terms and conditions of the pertinent insurance policies.

22. In their Answer (Exhibit "10") Excess Insurers asserted their right to appraisal.

23. By letter dated June 21, 2007 (Exhibit "11"), Excess Insurers appointed Peter Fogarty, CPA, of Hagen, Streiff, Newton & Oshiro, P.C., as their appraiser.

24. By letter dated June 22, 2007 (Exhibit "12"), Amerex, through counsel, indicated that it refused to participate in the appraisal process.

25. Based on the undiputed facts, the provision of the insurance contracts and the law applicable hereto, Excess Insurers make the within motion for an order compelling Amerex to appraise the dispute as to the amount of loss.

Dated: New York, New York
July 6, 2007

By: _____
MARK L. ANTIN